# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58117-5-II |
| Respondent, | |
| v. | |
| METOTISI ROPATI FILIPO, JR., | UNPUBLISHED OPINION |
| Appellant. | |

MAXA, J. – Metotisi Filipo, Jr. appeals his convictions of first degree burglary and misdemeanor violation of a court order and his sentence. The convictions were based on an incident where Filipo entered Connie Key's house in violation of a no-contact order. When the police arrived, Filipo held a knife to his throat and repeatedly asked the police to shoot him. Body camera footage showed Filipo's actions as well as four children leaving the house through a window.

We conclude that (1) the State presented sufficient evidence to convict Filipo of first degree burglary; (2) the trial court did not violate Filipo's constitutional right to present a defense by excluding an order terminating a different no-contact order in an unrelated case; (3) the trial court properly admitted the body camera footage of Filipo holding a knife to his throat and four children leaving the house through a window because the court found that the probative value outweighed any potential prejudice; and (4) as the State concedes, the crime victim penalty assessment (VPA) must be stricken from the judgment and sentence. Accordingly, we affirm Filipo's convictions, but we remand for the trial court to strike the VPA from his judgment and sentence.

FACTS

*Background*

In July 2020, the trial court issued a no-contact order that prohibited Filipo from contacting Key, the mother of his child, for five years. The order stated that Filipo was not to "knowingly enter, remain, or come within 1000 ft . . . of [Key's] residence, school, workplace" and not to:

> i) cause, attempt, or threaten to cause bodily injury to, assault, sexually assault, harass, stalk or keep under surveillance the protected person, or ii) engage in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, or iii) use, attempt to use or threaten to use physical force against the intimate partner or child that would reasonably be expected to cause bodily injury.

Ex. 9A, at 1.

In December 2022, Tacoma police officers responded to a domestic incident involving Filipo at Key's house. Upon dispatch, officers confirmed that there was a valid and active no-contact order prohibiting Filipo from contacting Key. When the officers arrived, they saw Filipo inside the house holding a knife to his throat and telling the officers to shoot him.

Eventually, Filipo exited the house and officers arrested him. The State charged Filipo with first degree burglary, felony violation of a court order, and fourth degree assault.

*Termination of a Different No-Contact Order*

Filipo requested that the trial court admit a September 1, 2022 order terminating a pretrial no-contact order between him and Key that was entered in May 2022 in an unrelated case. On the defendant's signature line was written "Counsel to notify," instead of Filipo's signature. Ex. 100, at 1. Filipo argued that this order was relevant to show whether he had knowledge of an active no-contact order on the day of the incident. The State objected on the basis of relevance.

The trial court denied admission, ruling that the 2022 termination order without Filipo's signature was not relevant to the issues in the case because there was no proof that Filipo was aware of the order. And any potential relevance "would be outweighed by the likelihood of confusing the jury about a document that's not related to this case." Rep. of Proc. (RP) at 95. But the court stated that its ruling "could change later in the trial." RP at 96.

*Admission of Body Camera Footage*

Elijah Allman, an officer for the Tacoma Police Department, responded to the incident at Key's house and was wearing a body camera. The trial court conducted a CrR 3.5 hearing to address the admissibility of statements Filipo made on Allman's body camera footage. During the hearing, the State played footage from the body camera. The State argued that Filipo's statements were not the product of custodial interrogation and requested to play a redacted version of the body camera footage at trial.

In responding to the State's argument, Filipo stated,

> [W]ith regard to the body camera, in addition, I would argue that that portion of the body camera and Mr. Filipo's statements are not relevant to the allegations in this case. They are unduly prejudicial, and a jury may find that his statements about asking the police to shoot him, it goes to his character and could be negatively used against him to make a jury believe he's more likely to have committed this offense, which is not related to this offense. . . . And then, I would also argue that the video about the children coming out the window is unduly prejudicial as well.

RP at 45-46.

The trial court ruled that the footage was "relevant for the purposes of state of mind" and that the probative value of the footage outweighed any prejudice. RP at 52.

*Trial*

Allman testified that when he arrived at Key's house on the night of the incident, Key stated that she had been assaulted and that Filipo was inside with a knife. As soon as he located

3

Filipo, Allman saw that Filipo was holding a knife against his own throat. According to Allman, Filipo told the police to shoot him. Allman stated that Filipo appeared frantic and fearful. But Filipo never pointed the knife at anyone other than himself. Allman testified that Key appeared to become increasingly more frightened throughout the incident.

Some of Allman's body camera footage was admitted as an exhibit and played at trial. The footage showed several officers approaching the house. The front door was open and Key was standing outside. Key told the officers, "He put his hands on me" while pointing inside. Ex. 14A. She told the officers that Filipo was inside and that he had a knife. As officers entered the front door, Filipo was holding a knife to his throat. The officers raised their guns. Key repeated several times that she had four kids inside. Filipo stood inside the house, holding a knife to his throat and repeatedly yelling for the officers to pull the trigger. He stated multiple times that the officers should kill him. While officers spoke to Filipo, Key and another man went to a window to the right of the front door and helped four children leave the house through the window.

Truitt Hartle, another responding Tacoma police officer, testified that he was responding to a court order violation. Upon arrival, Key stated that Filipo was inside with a knife and that he had hit her. When Hartle went inside, he saw Filipo holding a "large meat cleaver-style knife" to his neck. RP at 262. Filipo advanced toward the officers. Hartle stated that Filipo appeared to be highly agitated and was repeatedly yelling for the officers to shoot him.

Renate Klingenberg, another responding Tacoma police officer, testified that Key appeared to be shaken up and was having trouble breathing. Key was disheveled and had messy hair and slight swelling on her face.

The jury found Filipo guilty of first degree burglary (domestic violence) and misdemeanor violation of a court order (domestic violence). The jury found Filipo not guilty of felony violation of a court order and fourth degree assault.

Filipo appeals his convictions and sentence.

## ANALYSIS

A.    SUFFICIENCY OF EVIDENCE

Filipo argues that the State presented insufficient evidence to convict him of first degree burglary because (1) holding a knife to his throat did not satisfy the statutory definition of "deadly weapon" and (2) there was no evidence that he intended to commit a crime once inside Key's house. We disagree.

1.    Standard of Review

The test for determining the sufficiency of evidence is whether any rational trier of fact could find the elements of the charged crime beyond a reasonable doubt after viewing the evidence in a light most favorable to the State. *State v. Gouley*, 19 Wn. App. 2d 185, 194, 494 P.3d 458 (2021). We resolve all reasonable inferences in favor of the State and interpret inferences most strongly against the defendant. *Id.* And circumstantial and direct evidence are equally reliable. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017).

We review de novo questions of statutory interpretation. *State v. Sandoval*, 8 Wn. App. 2d 267, 272, 438 P.3d 165 (2019). We interpret statutes to determine and implement the legislature's intent. *Id.* "If the statute's plain language and ordinary meaning is clear, we look only to the statute's language to determine intent." *Id.* " '[W]e presume the legislature does not intend absurd results and, where possible, interpret ambiguous language to avoid such

5

absurdity.' " *Id.* at 273 (alteration in original) (quoting *State v. Ervin*, 169 Wn.2d 815, 823-24, 239 P.3d 354 (2010)).

> 2. Deadly Weapon

Filipo argues that the State failed to prove that he was armed with a deadly weapon as required by RCW 9A.52.020(1). We disagree.

RCW 9A.52.020(1) states,

> A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

The trial court ruled on Filipo's motion that RCW 9A.52.020(1)(b) did not apply in this case, which meant that the State had to prove that Filipo was armed with a deadly weapon.

A deadly weapon "include[s] any other weapon, device, instrument, article, or substance, . . . which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6). "[T]here must be some manifestation of willingness to use the [weapon] before it can be found to be a deadly weapon under RCW 9A.04.110(6)." *State v. Gotcher*, 52 Wn. App. 350, 354, 759 P.2d 1216 (1988).

Here, when the police first arrived, Key warned them that Filipo had a knife. Filipo held a knife to his throat and told the police to shoot him. Therefore, Filipo showed a willingness to use the knife and threatened to use the knife in a way that was "readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6); *see Gotcher*, 52 Wn. App. at 354.

Filipo claims that because he held the knife to his own throat, he only threatened to harm himself and not others. Therefore, it would be an absurd result to conclude that he was armed

6

with a deadly weapon. However, RCW 9A.04.110(6) does not differentiate between using a deadly weapon on oneself and on another. The statute requires only that the weapon be "readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6). Although Filipo ultimately used the knife only on himself, the knife certainly was capable of causing substantial bodily harm and he showed a willingness to use it. Moreover, there were four children in the house at the time Filipo was armed and based on the conduct reported by Keys, as well as the fact that the four children fled out the window, the jury could infer that the weapon was readily capable of causing harm to others. This is not an absurd result.

We conclude that the State presented sufficient evidence to prove that Filipo was armed with a deadly weapon.

3.   Intent to Commit a Crime

Filipo argues that the State failed to prove that he entered or remained in Key's house with the intent to commit a crime. We disagree.

As noted above, for first degree burglary RCW 9A.52.020(1) requires the State to prove that the defendant entered or remained unlawfully in a building "with intent to commit a crime against a person or property therein." RCW 9A.52.040 states,

> In any prosecution for burglary, any person who enters or remains unlawfully in a building may be inferred to have acted with intent to commit a crime against a person or property therein, unless such entering or remaining shall be explained by evidence satisfactory to the trier of fact to have been made without such criminal intent.

However, the State must still meet its evidentiary burden to prove a defendant's intent to commit a crime. *State v. Stinton*, 121 Wn. App. 569, 573, 89 P.3d 717 (2004).

In *Stinton*, the trial court issued a protection order prohibiting Stinton from McNeill's residence and from harassing contact with McNeill. 121 Wn. App. at 571. Stinton went to

7

McNeill's residence and began taking personal property. *Id.* When McNeill asked Stinton to leave, he pushed the door to prevent McNeill from shutting it and kicked the door in. *Id.*

The court held that the State presented evidence that Stinton unlawfully entered McNeill's residence and intended to violate the order's provision restraining him from making harassing contact with McNeill. *Id.* at 575. The court noted that a person can violate one or multiple protection order provisions. *Id.* And the evidence showing that Stinton harassed McNeill was "separate and distinct" from the evidence showing his unlawful entry. *Id.*

Here, Filipo concedes that the evidence demonstrated unlawful entry into Key's house, but he claims that he did not commit a separate violation of the no-contact order within the house. However, the no-contact order prohibited Filipo from entering Key's house *and* ordered him not to:

> i) cause, attempt, or threaten to cause bodily injury to, assault, sexually assault, harass, stalk or keep under surveillance the protected person, or ii) engage in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, or iii) use, attempt to use or threaten to use physical force against the intimate partner or child that would reasonably be expected to cause bodily injury.

Ex. 9A, at 1.

There was a reasonable inference that when Filipo entered the house and produced a large knife, he placed Key in reasonable fear of bodily injury. And once the police arrived, Key stated to the officers multiple times that she had four kids in the house. Then she helped the kids leave the house through a window. This showed that Key was in reasonable fear of bodily injury to her children. In addition, the body camera footage showed Key stating that Filipo had put his hands on her. Therefore, the evidence showing that Filipo violated the no-contact order was separate and distinct from the evidence showing his unlawful entry.

We conclude that the State presented sufficient evidence to prove that Filipo entered or remained in Key's house with the intent to commit a crime.

**B.    RIGHT TO PRESENT A DEFENSE**

Filipo argues that the trial court violated his constitutional right to present a defense when it prohibited him from presenting evidence of the September 2022 termination of a no-contact order in an unrelated case. We disagree.

1.    Legal Principles

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant's right to present a defense. *State v. Jennings*, 199 Wn.2d 53, 63 502 P.3d 1255 (2022). The Supreme Court has developed a two-step process when addressing evidentiary rulings and the right to present a defense. *Id.* at 58. First, we analyze the trial court's evidentiary rulings for abuse of discretion. *Id.* "Trial courts determine whether evidence is relevant and admissible." *Id.* at 59. An abuse of discretion occurs if no reasonable person would take the trial court's position. *Id.*

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. But although relevant, evidence still may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." ER 403. And trial courts are permitted to " 'exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.' " *Jennings*, 199 Wn.2d at 63 (alteration in original) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

Second, after analyzing the evidentiary rulings for an abuse of discretion, we consider de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. *Jennings*, 199 Wn.2d at 58. We balance the State's interest in excluding the evidence against the defendant's need for the evidence. *State v. Arndt*, 194 Wn.2d 784, 812, 453 P.3d 696 (2019). "In some instances regarding evidence of high probative value, 'it appears no state interest can be compelling enough to preclude its introduction.' " *Id.* (quoting *State v. Hudlow*, 99 Wn.2d 1, 16, 659 P.2d 514 (1983).

2. Relevance

Filipo sought to admit a September 2022 order – entered two months before the incident at issue – that terminated a pretrial no-contact order with Key in an unrelated case. Instead of Filipo's signature on the order, the order stated, "Counsel to notify." Ex. 100, at 1. The State objected and the trial court sustained the objection based on relevance.

The jury was required to find that Filipo knowingly violated the 2020 no-contact order in order to convict him of violation of a court order. And for first degree burglary, the State argued that the crime Filipo intended to commit when he entered Key's house was to violate the 2020 no-contact order. Therefore, Filipo argues that the 2022 termination order had the tendency to make his knowledge of whether the 2020 no-contact order was still active less probable.

However, even if Filipo had signed the 2022 termination order, that order was not relevant. The 2022 order terminated a no-contact order that was entered in an unrelated case. And that no-contact order had been entered only three months earlier, after the 2020 no-contact order had been in effect for almost two years. Finally, the 2022 no-contact order was a pretrial no-contact order which necessarily had a limited term, unlike the five year no-contact order entered in 2020. Given these facts, it is implausible that Filipo believed that the 2022 order

10

terminating the pretrial no-contact order also terminated the 2020 five year no-contact order. Without additional evidence showing Filipo's state of mind regarding the 2022 termination order, that order alone does not make Filipo's knowledge of the 2020 no-contact order more or less probable.

In addition, Filipo did not sign the 2022 termination order, and there was no evidence that he was aware of the termination order. In the absence of any other evidence, the 2022 termination order, standing alone, would invite speculation as to Filipo's knowledge of the order. Filipo argues that we should assume that Filipo's attorney notified him of the 2022 termination order. But if we make that assumption, we also may assume that his attorney properly explained to which case the order applied and that the 2020 no-contact order was still active. *See* RPC 1.4(a)(3) ("A lawyer shall . . . keep the client reasonably informed about the status of the matter.").

We conclude that the trial court did not abuse its discretion in excluding the 2022 termination order based on relevance.

### 3. Constitutional Right

A defendant's right to present a defense is not absolute. *State v. Arndt*, 194 Wn.2d 784, 812, 453 P.3d 696 (2019). The Supreme Court repeatedly has emphasized that a defendant has no right to present irrelevant evidence. *E.g.*, *State v. Orn*, 197 Wn.2d 343, 352, 482 P.3d 913 (2021). "Defendants have a right to present only relevant evidence, with no constitutional right to present *irrelevant* evidence." *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). Therefore, a defendant's evidence must at least have minimal relevance to implicate the right to present a defense. *Id.*

As discussed above, we conclude that the 2022 termination order was not relevant. Without any additional evidence, there is no indication that Filipo actually believed that the termination of a short, pretrial no-contact order in a different case terminated the five year 2020 no-contact order. And it is speculative whether Filipo even was aware of the 2022 termination order. Because the evidence was not relevant, we conclude that the trial court's exclusion of the 2022 termination order did not violate Filipo's constitutional right to present a defense.

C.      ADMISSION OF BODY CAMERA FOOTAGE

Filipo argues that the trial court erred in admitting body camera footage from the night of the incident because the evidence was irrelevant and prejudicial. We disagree.

        1.      Failure to Preserve Argument

Filipo argues that the trial court did not apply the required analysis before admitting the body camera footage to show consciousness of guilt. The State argues that Filipo cannot make this argument on appeal because he did not make the argument in the trial court. We agree.

Under RAP 2.5(a), "[t]he appellate court may refuse to review any claim of error which was not raised in the trial court." Specifically, "[w]e will not reverse the trial court's decision to admit evidence where the trial court rejected the specific ground upon which the defendant objected to the evidence and then, on appeal, the defendant argues for reversal based on an evidentiary rule not raised at trial." *State v. Powell*, 166 Wn.2d 73, 82, 206 P.3d 321 (2009).

Here, Filipo objected to Allman's body camera footage because it was "not relevant to the allegations in this case" and was "unduly prejudicial." RP at 45-46. But he did not argue that the evidence was being improperly admitted to show consciousness of guilt or that the trial court was required to apply a specific analysis before admitting the evidence on that basis. Therefore, we conclude that Filipo cannot make this argument on appeal.

2.    Footage Showing Filipo Holding a Knife to His Throat

Allman's body camera footage showed Filipo holding a knife to his throat and telling the police to shoot him. Filipo claims this footage was irrelevant and unduly prejudicial. We disagree.

As noted above, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. But although relevant, evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403. We review the trial court's evidentiary rulings for abuse of discretion. *Jennings*, 199 Wn.2d at 58. The trial court has considerable discretion to consider what evidence is relevant and to balance its possible prejudicial impact against its probative value. *State v. Barry*, 184 Wn. App. 790, 801, 339 P.3d 200 (2014).

Here, the footage showing Filipo holding a knife was directly relevant to the issue of whether Filipo was armed with a deadly weapon for purposes of the first degree burglary charge. The footage showed that Filipo was using the knife in a manner that was "readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6). Therefore, the footage made the fact that he was armed with a deadly weapon more probable. In addition, the body camera footage was the best evidence of what actually happened during the incident.

Filipo argues that the body camera footage was unduly prejudicial because the jury could have interpreted his erratic and dangerous behavior as making him more likely to commit the charged crimes. Certainly, the footage was somewhat prejudicial. But given the clear relevance

of the body camera footage, we conclude that the trial court did not abuse its discretion in determining that the probative value of the footage outweighed any prejudicial effect. Therefore, we conclude that the trial court did not err in admitting the body camera footage showing Filipo holding a knife to his throat.

3.    Footage Showing Children Leaving Through the Window

Although Allman's body camera focused on Filipo holding a knife to his throat, the footage also showed Key's children leaving the house through a window. Filipo claims this portion of the footage was irrelevant and unduly prejudicial. We disagree.

The body camera footage showing the children leaving the house through the window was directly relevant to the issue of whether Filipo intended to commit a crime when entering Key's house. The State argued that the crime Filipo intended to commit was to violate the 2020 no-contact order. The order prohibited Filipo from engaging in "conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child." RP at 228. The footage showing Key helping the children leave through the window was relevant because it showed that Key was in reasonable fear that Filipo would cause bodily injury to her children.

Filipo argues that the footage was unduly prejudicial because it likely stimulated an emotional response from the jury rather than a rational decision. He also claims that the footage assigned him blame for causing the children to endure a traumatic incident. Again, this portion of the footage was somewhat prejudicial. But given the clear relevance of this portion of the body camera footage, we conclude that the trial court did not abuse its discretion in determining that the probative value of the footage outweighed any prejudicial effect. Therefore, we conclude that the trial court did not err in admitting the body camera footage showing the children leaving the house through a window.

D.     CRIME VICTIM PENALTY ASSESSMENT

Filipo argues, and the State concedes, that the $500 VPA should be stricken from his judgment and sentence.  We agree.

Effective July 1, 2023, RCW 7.68.035(4) prohibits courts from imposing the VPA on indigent defendants as defined in RCW 10.01.160(3).  *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).  For purposes of RCW 10.01.160(3), a defendant is indigent if they meet the criteria in RCW 10.101.010(3).  Although this amendment took effect after Filipo's sentencing, it applies to cases pending on appeal.  *Ellis*, 27 Wn. App. 2d at 16.

The trial court determined that Filipo was indigent under RCW 10.101.010(3). Therefore, we remand for the trial court to strike the $500 VPA from the judgment and sentence.

CONCLUSION

We affirm Filipo's convictions, but we remand for the trial court to strike the VPA from his judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
CRUSER, C.J.

_____
GLASGOW, J.

15